## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

Raymond Alexis Munoz Robles,

                Plaintiff,

v.

Andrew Saul, Commissioner of Social
Security,

                Defendant.

Civil No. 3:19-cv-01329 (TOF)

September 9, 2020

## RULING ON PENDING MOTIONS

The Plaintiff, Raymond Alexis Munoz Robles, appeals the final decision of the Defendant, Andrew Saul, Commissioner of Social Security ("Defendant" or "Commissioner"), on his applications for Title II Disability Insurance Benefits and Title XVI Supplemental Security Income benefits. (ECF No. 14.) He seeks "an order reversing the decision of the Commissioner and awarding benefits" or, "[i]n the alternative," "an order reversing the decision of the Commissioner [and] remanding the matter to the Commissioner for a *de novo* hearing" pursuant to 42 U.S.C. § 405(g). (ECF No. 14-2, at 19.) The Defendant has moved for an order affirming his final decision. (ECF No. 22.)

The Plaintiff's principal argument is that the Administrative Law Judge ("ALJ") failed in his duty to develop the administrative record. (ECF No. 14-2, at 1-11.) Among other claims of error, he says that the ALJ should have obtained medical source statements from his treating physicians and clinicians. (*Id.*) The Plaintiff argues that the ALJ could not properly reach two of his key conclusions without such statements – first, the conclusion at "Step Two" that his cardiac, hand and mental health impairments are "non-severe;" and second, the conclusion that he has "the

residual functional capacity to perform the full range of sedentary work." (*Id.* at 1-12.) In response, the Defendant concedes that the ALJ did not obtain opinion evidence from any treating provider, but nevertheless argues that "the lack of a medical source statement from a treating provider does not render the record incomplete or require remand" in this case. (ECF No. 22-1, at 10) (citing *Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29 (2d Cir. 2013) (summary order)).

The Court agrees with the Plaintiff with respect to his heart problems. While medical source statements are not required in all cases, *see Tankisi*, 521 F. App'x at 33-34, they are when the record otherwise contains no "insight into how [the claimant's] impairments affect or do not affect her ability to work, or her ability to undertake her activities of everyday life." *Guillen v. Berryhill*, 697 F. App'x 107, 109 (2d Cir. 2017) (summary order). The Court has reviewed the entire administrative record, and while that record does contain information on the diagnosis and treatment of the Plaintiff's cardiac ailments, it does not contain any information on how those ailments affect his ability to work. Without such information, the ALJ had an insufficient basis for concluding that the ailments were "non-severe" or that the Plaintiff could do "the full range of sedentary work." As another court recently explained, where the record contains "raw medical data and/or bare medical findings . . . but do[es] not assess Plaintiff's functional abilities to do work related activities . . . remand is warranted." *Hernandez v. Saul*, No. 3:19-cv-01033 (WIG), 2020 WL 3286954, at *4 (D. Conn. June 18, 2020); (*see also* discussion, Section III.A *infra*).

The Plaintiff's other claimed impairments present closer calls (*see* discussion, Section III.B *infra*), but the cardiac issues alone merit remand. The Plaintiff's Motion to Reverse (ECF No. 14) is therefore **GRANTED IN PART AND DENIED IN PART** as explained more fully in Section IV below; the Defendant's Motion to Affirm (ECF No. 22) is **DENIED**; and this matter is remanded to the Commissioner for further administrative proceedings consistent with this opinion.

I.    **BACKGROUND**

On September 20, 2016, the Plaintiff applied for Disability Insurance Benefits pursuant to Title II and Supplemental Security Income pursuant to Title XVI.  (R. 226, 230.)  He alleged a disability onset date of April 17, 2016.  (*Id.*)  He listed his medical conditions as "scoliosis, heart condition, diabetes, high blood pressure, [and] back surgery prior."  (R. 269.)  The Social Security Administration ("SSA") denied his applications and subsequent request for reconsideration.  (R. 134, 149.)  The Plaintiff then requested a hearing before an ALJ.  (R. 168.)  ALJ Ryan A. Alger held a hearing on September 4, 2018.  (R. 36.)

After the hearing, the ALJ issued an unfavorable Notice of Decision.  (R. 15.)  Following the familiar five-step sequential evaluation process, at Step One the ALJ found that the Plaintiff had not engaged in substantial gainful activity since the alleged onset date of April 17, 2016.  (R. 21.)  At Step Two, he found that the Plaintiff suffered from the severe impairments of "curvature of the lumbar spine, obesity, diabetes, high blood pressure and sleep apnea."  (*Id.*)  The ALJ also concluded that the Plaintiff's coronary artery disease ("CAD"), osteoarthritis of the hand, and depression were "nonsevere" impairments that did not result in any more than mild limitations in any of the functional areas. (R. 21-23.)  At Step Three, the ALJ determined that the Plaintiff's impairments or combination of impairments did not meet or equal a listed disability enumerated in 20 C.F.R. § 404, Subpart P., App. 1.  (R. 23-24.)  Next, the ALJ found that the Plaintiff retained the residual functional capacity "to perform the full range of sedentary work as defined in 20 CFR 404.1567 and 416.967(a)."  (R. 24.)  At Step Four, the ALJ found that the Plaintiff was unable to perform any past relevant work.  (R. 27.)  Finally, at Step Five, the ALJ relied on the testimony of a vocational expert to find that there are jobs that exist in significant numbers in the national

economy that the Plaintiff could perform.  (R. 27.)  Accordingly, the ALJ determined that the Plaintiff was not disabled from the alleged onset date of April 17, 2016. (R. 28.)

The Plaintiff then submitted an appeal to the Appeals Council.  (R. 224-25.)  The Council affirmed the ALJ's decision (R. 1-4) and the Plaintiff timely appealed to this Court.  He filed a motion to reverse and/or remand on January 10, 2020.  (ECF No. 14.)  The Commissioner filed his motion to affirm on April 17, 2020.  (ECF No. 22.)  Both motions were accompanied by statements of material facts, with largely overlapping medical chronologies.[1]  (ECF Nos. 14-1, 22-2.)  Portions of the Plaintiff's medical history will be set forth below, as necessary to explain the Court's decision.

## II.   <u>APPLICABLE LEGAL PRINCIPLES</u>

To be considered disabled under the Social Security Act, "a claimant must establish an 'inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.'"  *Smith v. Berryhill*, 740 F. App'x 721, 722 (2d Cir. 2018) (summary order) (quoting 20 C.F.R. § 404.1505(a)).  To determine whether a claimant is disabled, the ALJ follows a five-step evaluation process.

At Step One, the ALJ determines "whether the claimant is currently engaged in substantial gainful activity . . . ."  *McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014) (citing *Burgess v. Astrue*, 537 F.3d 117, 120 (2d Cir. 2008)).  At Step Two, the ALJ analyzes "whether the claimant has a severe impairment or combination of impairments . . . ."  *McIntyre*, 758 F.3d at 150.  At Step

---

[1]   The Defendant "generally agrees to Plaintiff's recitation of the facts," although he "objects to any argumentative or subjective statements" and adds a few supplemental facts of his own. (Def.'s Stmt. of Material Facts, ECF No. 22-2, at 1.)  Unless otherwise noted, all citations to the Plaintiff's Statement of Material Facts are to facts that the Court understands to be uncontested.

Three, the ALJ evaluates whether the claimant's disability "meets or equals the severity" of one of the specified impairments listed in the regulations. *Id.* At Step Four, the ALJ uses a "residual functional capacity" assessment to determine whether the claimant can perform any of her "past relevant work . . . ." *Id.* At Step Five, the ALJ assesses "whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's residual functional capacity, age, education, and work experience." *Id.* The claimant bears the burden of proving her case at Steps One through Four. *Id.* At Step Five, "the burden shift[s] to the Commissioner to show there is other work that [the claimant] can perform." *Brault v. Soc. Sec. Admin., Comm'r,* 683 F.3d 443, 445 (2d Cir. 2012) (per curiam).

In reviewing a final decision of the Commissioner, this Court "perform[s] an appellate function." *Zambrana v. Califano*, 651 F.2d 842, 844 (2d Cir. 1981). "The court's role is limited to determining (1) whether the decision comports with applicable law and (2) whether it is supported by substantial evidence." *Alford v. Saul*, 417 F. Supp. 3d 125, 136 (D. Conn. 2019) (citing *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987)). An analysis of the decision's congruence with applicable law typically comes first, because "[e]ven if the Commissioner's decision is supported by substantial evidence, legal error alone can be enough to overturn the ALJ's decision." *Ellington v. Astrue*, 641 F. Supp. 2d 322, 328 (S.D.N.Y. 2009) (citing *Johnson,* 817 F.2d at 986).

One way a decision can fail to "comport[] with applicable law" is when the ALJ fails to properly develop the administrative record. "Because a hearing on disability benefits is a non-adversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record." *Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996). The Social Security regulations in place at the time of the Plaintiff's application described this duty by stating that,

5

"[b]efore we make a determination that you are not disabled . . . [w]e will make every reasonable effort to help you get medical reports from your own medical sources when you give us permission to request the reports." 20 C.F.R. § 404.1512(d) (2015). While the ALJ's duty to develop the record is heightened when the claimant appears at the hearing *pro se*, *see Moran v. Astrue*, 569 F.3d 108, 113 (2d Cir. 2009), it nonetheless exists where, as here, he is represented by counsel. *Perez*, 77 F.3d at 47 ("This duty exists even when the claimant is represented by counsel . . . .").

Under the regulations in force at the time of the Plaintiff's claim, the ALJ's duty to develop the record typically included a duty to obtain opinion evidence from a claimant's treating providers. As the Second Circuit explained, "the plain text of the regulation does not appear to be conditional or hortatory: it states that the Commissioner '*will* request a medical source statement' containing an opinion regarding the claimant's residual capacity." *Tankisi*, 521 F. Appx. at 33 (citing 20 C.F.R. §§ 404.1513(b)(6), 416.913(b)(6)). To be sure, failure to obtain a medical source statement is not reversible legal error in all cases. *Id.* at 33–34 ("[R]emand is not always required when an ALJ fails in his duty to request opinions, particularly where, as here, the record contains sufficient evidence from which an ALJ can assess the petitioner's residual functional capacity.") (internal citations omitted); *see also Sanchez v. Colvin*, No. 13-Civ.-6303 (PAE), 2015 WL 736102 at *5 (S.D.N.Y. Feb. 20, 2015) ("[I]t is not *per se* error for an ALJ to make a disability determination without having sought the opinion of the claimant's treating physician."). In deciding whether a failure to obtain a treating source opinion constitutes reversible error, "the central question . . . is whether, '[g]iven the specific facts of the case,' the administrative record before the ALJ . . . although lacking the opinion of [the claimant's] treating physician, was sufficiently comprehensive 'to permit an informed finding by the ALJ.'" *Sanchez*, 2015 WL 736102, at *6 (quoting *Tankisi*, 521 F. App'x at 33-34).

An ALJ typically cannot make an "informed" disability finding from a record composed exclusively of raw medical data.  Because ALJs are not doctors, they ordinarily cannot translate diagnoses, medical test results and the like into functional, vocational terms without the aid of a medical provider's "insight into how [the claimant's] impairments affect or do not affect her ability to work, or her ability to undertake her activities of daily life." *See Guillen*, 697 F. App'x at 109. When ALJs attempt this translation without that medical insight, courts ordinarily regard it as reversible error.  As noted above, when "the treatment notes and test results from the claimant's treating physicians do not assess how the claimant's symptoms limit her functional capacities, remand is warranted." *Hernandez*, 2020 WL 3286954, at *4 (quoting *Angelico v. Colvin*, No. 3:15-cv-00831 (SRU) (JGM), ECF No. 17 at 33 (D. Conn. Feb. 8, 2017)) (brackets omitted).

The case of *Holt v. Colvin* shows these principles in action.  In *Holt*, the claimant suffered from carpal tunnel syndrome, asthma, obesity and a variety of spinal ailments.  No. 3:16-CV-01971 (VLB), 2018 WL 1293095, at *1-4 (D. Conn. Mar. 13, 2018).  An ALJ concluded that she could perform "light work as defined in [the Social Security regulations]," subject to a few limitations. *Id.* at *4.  When the claimant appealed to the district court, the Commissioner urged affirmance, pointing out that the medical record was "quite extensive" and consisted of "nearly 1,000 pages of medical evidence." *Id.* at *7.  But the Court noted that "the real import lies in *what* those 1,000 pages say, not the mere fact that the records exist." *Id.* (emphasis in original).  The medical records "merely indicated [the claimant's] diagnosis and symptoms;" "[n]ot one treating physician opined about [her] functional limitations with respect to her ability to work . . . ." *Id.* The Court reversed the ALJ's decision and remanded the case because the ALJ had attempted to translate the medical evidence into functional terms without a medical source statement.  "An ALJ cannot determine the RFC solely 'on the basis of bare medical findings, and as a result an ALJ's

determination of RFC without a medical adviser's assessment is not supported by substantial evidence.'" *Id.* (quoting *Guarino v. Colvin*, No. 1:14-cv-00598 (MAT), 2016 WL 690818, at *2 (W.D.N.Y. Feb. 22, 2016)).   As another court put it, "where the medical findings in the record merely diagnose the claimant's exertional impairments and do not relate these diagnoses to specific residual functional capabilities such as those set out in 20 C.F.R. § 404.1567(a) . . . . the Commissioner may not make the connection himself." *Staggers v. Colvin*, No. 3:14-cv-00717 (SALM), 2015 WL 4751108, at *3 (D. Conn. June 17, 2015) (quoting *Walker v. Astrue*, No. 08–CV–0828(A)(M), 2010 WL 2629832, at *6 (W.D.N.Y. June 11, 2010)).

If the ALJ adequately developed the record and otherwise avoided legal error, the Court may set her decision aside "only if the factual findings are not supported by substantial evidence." *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000) (internal quotation marks omitted).   A decision is supported by substantial evidence if a "reasonable mind" could look at the record and make the same determination as the Commissioner.   *Williams on Behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988) (defining substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion . . .") (internal citations omitted).   Although the standard is deferential, "[s]ubstantial evidence is more than a mere scintilla.   It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 507 (2d Cir. 2009) (internal quotation marks and citations omitted).   "Where the Commissioner's decision rests on adequate findings supported by evidence having rational probative force, [this Court] will not substitute [its] judgment for that of the Commissioner." *Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002).   Put differently, "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."   42 U.S.C. § 405(g).

Having set forth the applicable legal principles, the Court will apply them to the Plaintiff's case.  The Court will first consider the Plaintiff's CAD, and then his other claimed impairments.

III.   **DISCUSSION**

A.   **Application of the Foregoing Principles to the Plaintiff's CAD**

As noted above, the ALJ found that the Plaintiff's CAD was "non-severe," and he concluded that the Plaintiff retained the "residual functional capacity to perform the full range of sedentary work."  (R. 21-26.)  An impairment is "non-severe" "if it does not significantly limit [the claimant's] physical or mental ability to do basic work activities."  20 C.F.R. § 404.1522;  20 C.F.R. § 416.922.  The "full range of sedentary work" requires, among other things, that the claimant be able to lift ten pounds and "stand and walk for a total of approximately 2 hours during an 8-hour workday."  20 C.F.R. §§ 404.1567(a), 416.967(a); *Social Security Ruling* 96–9p, 1996 WL 374185, at *6 (S.S.A. July 2, 1996) ("SSR 96-9p").  Taking these definitions together with the above-cited legal principles, the Plaintiff's challenge to the sufficiency of the record may be rephrased as follows:  did the ALJ have some substantial basis, beyond bare medical findings, upon which to conclude that the Plaintiff's CAD did not significantly limit his physical or mental ability to do basic work activities, and upon which to conclude that the plaintiff could lift up to ten pounds and stand and walk for two hours in an eight-hour shift?

In the case of the Plaintiff's CAD, the Court concludes that the answer to the question is "no."  In the absence of treating provider opinions, the ALJ had three sources of information about the Plaintiff's cardiac ailments – (1) medical records from his cardiologist, Dr. Morley; from Waterbury Hospital; and from other providers; (2) a report from a consulting examiner, Dr. Yakov Kogan (R. 1825-28); and (3) reports from two non-examining state agency consultants, Drs. Henry Scovern and Anita Bennett.  (R. 77-80, 108-11.)  None of these three sources of information

provided the ALJ with a sufficient foundation for his conclusions about the effects of the Plaintiff's CAD on his functional capabilities.

### 1.    The medical records

To support his conclusions about the impact of the Plaintiff's CAD, the ALJ cited records from Cardiology Associates of Waterbury, Alliance Medical Group, Waterbury Hospital, and StayWell Health Care.  (R. 21.)  These records document the Plaintiff's symptoms, the diagnostic tests done, and the treatments provided, but none include any data on the degree to which the Plaintiff's CAD would interfere with his ability to work.  For example, an office treatment record from Dr. Morley at Cardiology Associates states that the Plaintiff has "mild dyspnea[2] with exertion" and that the "[d]yspnea has improved . . . ."  (R. 1889-91.)  Dr. Morley does not define "mild" dyspnea, explain the type or intensity of exertion that would result in dyspnea, or conclude that the Plaintiff has the residual capacity to do any particular task.  In short, none of these records contain any statements that might be construed as assessments of the Plaintiff's functional or work-related limitations resulting from his cardiac impairments.

The facts the ALJ chose to include in his decision only highlight the lack of functional assessments in the cited medical records.  The ALJ wrote: "A cardiac catherization in September 2016 revealed [the Plaintiff's] left anterior descending artery was fifty percent occluded and a normal ejection fraction.  A stress test was negative for ischemia.  The claimant has no history of myocardial infarction and his treating cardiologist did not recommend stent placement.  He treated the claimant's cardiac condition with medication.  The claimant has a systolic heart murmur but a September 2016 cardiac catheterization resulted in a diagnosis of non-critical coronary artery

---

[2]     Dyspnea is "short[ness] of breath" or "difficult or labored respiration."  Webster's New Collegiate Dict. 353 (8th ed. 1980).

disease." (R. 21.)  This is raw medical data, not opinion evidence on what the Plaintiff retains the capacity to do or not do.  The only way that the ALJ could have reached his conclusion from this raw data was to make his own, inexpert interpretation of the functional implications of the Plaintiff's tests and treatments.  In the absence of a functional assessment, however, the ALJ cannot connect the dots between the raw medical data and the Plaintiff's functional limitations on his own. *Quinto v. Berryhill*, No. 3:17-CV-00024 (JCH), 2017 WL 6017931, at \*12 (D. Conn. Dec. 1, 2017).  As previously noted, "where the medical findings in the record merely diagnose the claimant's exertional impairments and do not relate these diagnoses to specific residual functional capabilities such as those set out in 20 C.F.R. § 404.1567(a) . . . . the Commissioner may not make the connection himself."  *Staggers*, 2015 WL 4751108, at \*3.

Relatedly, in assessing how the Plaintiff's severe impairment of hypertension impacted his RFC, the ALJ noted that the "overall medical record did not indicate any end-organ damage or visual difficulty relating to the hypertension" and that the Plaintiff "has no history of myocardial infarction." (R. 25-26.)  The ALJ's conclusions are not an entirely accurate reflection of the record. The record shows that the Plaintiff has a history of Non-ST-elevation myocardial infarction (NSTEMI), (R. 526, 528, 790, 989), and that he was examined by a practitioner at Opticare and was assessed as having hypertensive retinopathy.  (R. 919.)  Yet even if the ALJ's statements were accurate, they would still not shed sufficient light on the Plaintiff's ability to work.  To be sure, end-organ damage, visual difficulties, or a myocardial infarction could certainly limit the Plaintiff's functioning further.  But the fact that the Plaintiff's condition could be worse does not necessarily support a conclusion that he is healthy enough to work.  "To receive benefits under the Social Security Act, one need not be completely helpless or unable to function . . . ." *Gold v. Sec'y of Health, Ed. & Welfare*, 463 F.2d 38, 41 n.6 (2d Cir. 1972); *accord Rivera v. Schweiker*, 717

F.2d 719, 722 (2d Cir. 1983).  The ALJ's opinion – that is, that a person with hypertension and the Plaintiff's other cardiac ailments can perform a full range of sedentary work so long as there is no end-organ damage, visual difficulties, or history of myocardial infarction – is not supported by any medical opinion evidence in the record.

The ALJ also based his evaluation of the Plaintiff's cardiac problems, in part, on the treatments that Dr. Morley did and did not recommend.  The ALJ noted that the Plaintiff's "treating cardiologist did not recommend stent placement" (R. 21) and that the Plaintiff's heart conditions were treated "conservatively" with medication.  (R. 21, 26.)  But a physician's recommendation of conservative treatment does not necessarily mean that the Plaintiff's condition is non-severe. An ALJ may not determine "that the severity of a physical impairment directly correlates with the intrusiveness of the medical treatment ordered."  *Shaw*, 221 F.3d at 134-35.  To the contrary, the ALJ's commentary on Dr. Morley's prescribed treatment seems to make the doctor's medical source opinion more necessary, not less.  The ALJ clearly thought that Dr. Morley's choice of treatment was important in determining the Plaintiff's RFC, but he did not seek out the doctor's opinion.

The lack of substantive records about the Plaintiff's functional limitations is particularly apparent when considering the ALJ's RFC determination.  The ALJ determined that the Plaintiff was able to perform the full range of sedentary work, which requires, among other things, "that an individual be able to stand and walk for a total of approximately 2 hours during an 8–hour workday."  SSR 96–9p, 1996 WL 374185, at *6.  "[A] limitation to standing and walking for a total of only a few minutes during the workday would erode the unskilled sedentary occupational base significantly."  *Id.*  The Plaintiff stated in his "Activities of Daily Living" report that he could only walk "5 to 10 min." (R. 281) and testified during the benefits hearing that he has daily dizzy

spells that affect his ability to walk. (R. 47-48.)  None of the Plaintiff's treating providers made any assessment of his ability or walk or stand, nor is such information contained in the medical records.  In addition, "the occupational base for an individual who must use [a medically required hand-held device] for balance because of significant involvement of the lower extremities . . . . may be significantly eroded."  SSR 96–9p, 1996 WL 374185, at *7.  The Plaintiff testified that he needs a cane to walk and to balance while standing still (R. 55), and the record contains many references to his use of a cane.  (R. 476, 1188, 1318, 1534-35, 1642-43, 1712, 1828, 1835, 1935, 2015-16, 2049-50, 2280.)  Yet, the record contains no assessment of how the Plaintiff's use of a cane would impair or otherwise affect his ability to work.

2.      **The consulting examiner**

The ALJ based his conclusions in part on a report from a consulting examiner, Dr. Yakov Kogan (R. 21, 25-26), but under the facts of this case, that report did not obviate the need for a treating source opinion.  Dr. Kogan found the Plaintiff to have a "[r]egular heart rate and rhythm," without "murmurs, rubs or gallops," and he therefore reported the Plaintiff's "cardiac and pulmonary exam findings [as] normal except [for] moderately elevated blood pressure of 150/90." (R. 1827-28.)  The ALJ apparently relied exclusively on this statement in determining that the Plaintiff's CAD was a "non-severe impairment[]," and referred to Dr. Kogan's statement again when arriving at his RFC determination.  (R. 21, 25-26.)  Yet there are at least three problems with the ALJ's reliance on Dr. Kogan's report.

First, Dr. Kogan's "normal" finding was sufficiently out of sync with the medical records to trigger the ALJ's duty to obtain a treating source opinion.  Dr. Kogan reported that the Plaintiff has no heart murmur, but the treating cardiologist found otherwise:  the treatment notes at Exhibits 7F, 34F, 36F and 39F all documented a "systolic murmur," "grade 3/6 at the apex."  (R. 476, 1835,

13

1890, 1940.)  Moreover, Dr. Kogan reported "normal" "cardiac and pulmonary exam findings" (R. 1828), but the Plaintiff's September 23, 2016 cardiac catheterization study revealed that his left anterior descending coronary artery was fifty percent occluded.[3]  (R. 601, 747.)  An ALJ should not rely on consultative exam findings that disagree with the claimant's treating physician's findings without at least trying to resolve the discrepancy.  *Cf. Tankisi*, 521 F. App'x at 34 (finding that "[t]he opinions of consulting physicians . . . generally have less value than the opinions of treating physicians" and that the ALJ did not err in relying on the opinions of the consulting physicians when the ALJ "did not credit the consulting physicians to the exclusion of [the plaintiff's] treating physicians"); *Perez Garcia v. Berryhill*, No. 3:18-CV-00986 (WIG), 2019 WL 2022191, at *5 (D. Conn. May 8, 2019) ("[T]he ALJ's decision to credit the opinion of a consultative examiner over the opinion of a treating source flips the presumption in favor of the opinions of treating physicians on its head.") (internal quotation marks omitted); *Donnelly v. Comm'r of Soc. Sec.,* 49 F.Supp.3d 289, 305 (E.D.N.Y. 2014) ("[T]he ALJ cannot rely solely on [the] RFCs [of the consulting examiners] as evidence contradicting the Treating Physician RFC. This is because an inconsistency with a consultative examiner is not sufficient, on its own, to reject the opinion of the treating physician.").

Second, even Dr. Kogan did not opine on whether the Plaintiff could exert himself sufficiently to justify the ALJ's "non-severe" and "full range of sedentary work" conclusions. After reporting that the Plaintiff's "cardiac and pulmonary exam findings" were "normal except [for] moderately elevated blood pressure of 150/90," Dr. Kogan expressly declined to give an

---

[3]    The ALJ noted that although the Plaintiff's left anterior coronary artery was fifty percent blocked, his "ejection fraction" – a measure of the amount of blood pumped with each heartbeat – was "normal." (R. 21.) But translating these two raw medical findings into functional, vocational terms is something that an ALJ should not attempt without a medical source statement. *Holt*, 2018 WL 1293095, at *7.

opinion on exertional limitations, evidently because he had not been provided with the Plaintiff's complete medical record. (R. 1828.) Specifically, the doctor wrote that "[e]xertional limitations related to cardiac disease can be delineated further with access to prior cardiac catheterization results and any prior cardiac stress test or cardiac echo studies." (*Id.*) Dr. Kogan also reported that the Plaintiff "ambulate[d] independently" in the office without a cane, notwithstanding his "mildly reduced bilateral step length and speed," but he did not assess how long the Plaintiff would be able to stand and walk in an average workday. (*Id.*) He concluded that the Plaintiff had a "much better level of function observed outside the formal exam setting" but he did not formally assess the Plaintiff's limitations, either inside or outside the formal exam setting. (*Id.*)

Third, even if Dr. Kogan had evaluated the Plaintiff's functional limitations, the Second Circuit has "cautioned that ALJs should not rely heavily on the findings of consultative physicians after a single examination." *Selian v. Astrue*, 708 F.3d 409, 419 (2d Cir. 2013) (per curiam). "This is justified because consultative exams are often brief, are generally performed without benefit or review of claimant's medical history and, at best, only give a glimpse of the claimant on a single day." *Cruz v. Sullivan*, 912 F.2d 8, 13 (2d. Cir. 1990) (internal quotation marks omitted); see *also Stellmaszyk v. Berryhill*, No. 16-cv-09609 (DF), 2018 WL 4997515, at *24 (S.D.N.Y. Sept. 28, 2018) ("While, as described above, the treatment notes in the Record are extensive, the total absence of a functional assessment by any treater, coupled with the lack of a detailed explanation of Plaintiff's physical limitations from any consultative examiner, means that the ALJ could not have had an adequate informational basis from which to determine Plaintiff's RFC."). In summary, Dr. Kogan's consultative examination report did not obviate the need for a medical source statement from the Plaintiff's treating cardiologist.

### 3. The non-examining state agency consultants

As the Defendant notes, two "State agency medical consultants opined that Plaintiff could perform work at either a light or medium exertional level[]" – but he also concedes that "[t]he ALJ provided these opinions with little weight." (ECF No. 22-1, at 8) (citing R. 26, 79-80, 108-11). Indeed, the ALJ expressly stated that he gave these two opinions "little consideration" in reaching his conclusions, pointing out that the consultants "did not have the opportunity to the interview the claimant or to review all available medical evidence entered into the record at the hearing level." (R. 26.)

Where, as here, the claimant's medical record "do[es] not shed any light" on his RFC, the opinion of a non-examining state agency consultant is ordinarily not a sufficient substitute for the opinion of his treating provider. *See Guillen*, 697 F. App'x. at 108-09 (remand required where "the medical records obtained by the ALJ [did] not shed any light on Guillen's residual functional capacity, and the consulting doctors did not personally evaluate Guillen"); *see also Card v. Berryhill*, No. 3:18-CV-1060 (AWT), 2019 WL 4438322, at *4 (D. Conn. Sept. 16, 2019) (same). Stated differently, opinions by non-examining consultants cannot fill the gap created by the absence of treating physician opinions when the medical records "do[] not provide a sufficient basis" to determine a claimant's RFC. *Borelli v. Berryhill*, No. 3:18-CV-801 (VLB), 2019 WL 4233586, at *13 (D. Conn. Sept. 6, 2019). As discussed above, in this case the record does not shed any light on the limitations that the Plaintiff's CAD place upon his ability to do even sedentary work. The two non-examining state agency opinions therefore do not constitute "sufficient evidence from which an ALJ can assess the [Plaintiff's] residual functional capacity." *Tankisi*, 521 F. App'x at 34; *see also Dowling v. Saul*, No. 3:19-CV-01170 (WIG), 2020 WL 2079113, at *5 (D. Conn. Apr. 30, 2020) (holding that the ALJ could not rely on the assessments of the State

agency physicians to formulate the RFC "because there [was] _no_ medical opinion from a treating physician and/or specialist addressing the functional limitations that flow from Plaintiff's physical impairments") (emphasis in original). ‼

### 4.   Conclusion re: The Plaintiff's CAD

In conclusion, the Court addresses some of the Defendant's other arguments.   The Defendant cites _Pellam v. Astrue_ for the proposition that "where the ALJ had all of the treatment notes from Plaintiff's treating physicians there was no need to supplement the record by acquiring a medical source statement from a treating physician."  (ECF No. 22-1, at 10) (citing _Pellam_, 508 F. App'x 87, 90 (2d Cir. 2013) (summary order)).  But _Pellam_ is clearly distinguishable.  In _Pellam_, a consultative examiner issued clear opinions about the claimant's functional limitations.  _Id._ at 89 (recounting that consultative examiner had opined that the claimant had "moderate to severe limitations for bending, twisting through the neck and lumbar spine," etc.).  Although the ALJ claimed to have "rejected" the examiner's opinion, his "ultimate residual functional capacity determination was consistent with [the examiner's] analysis in all relevant ways."  _Id._ at 90.  The Second Circuit concluded that the ALJ did not need a treating provider opinion because the consultant's "medical opinion largely supported the ALJ's assessment of [the claimant's] residual functional capacity."  _Id_.  While the Court did note that "the ALJ also had all of the treatment notes from Pellam's treating physicians," _id._, the key point was that a doctor had offered an opinion about the effect of the claimant's impairments on her ability to work, and the RFC was supported by that opinion.  In this case, by contrast, the consulting examiner expressly declined to opine about the effect of the Plaintiff's CAD on his functional capabilities.  (R. 1828) (declining to opine about "[e]xertional limitations related to cardiac disease" because of his lack of "access to prior

cardiac catheterization results and any prior cardiac stress test or cardiac echo studies"). This case is therefore more like *Guillen* than *Pellam* with respect to the Plaintiff's CAD.

The Defendant also argues that a failure to obtain a treating source opinion would be a harmless error at Step Two, because the ALJ "properly proceeded with the subsequent steps." (ECF No. 22-1, at 6) (citing *Reices-Colon v. Astrue*, 523 F. App'x 796, 798 (2d Cir. 2013) (summary order)). This argument may be correct as far as it goes, and indeed the Plaintiff seems to concede as much. (ECF No. 14-2, at 12) (acknowledging, in the context of his mental impairments, that "[h]ad the ALJ gone on to consider [them] later in the decision . . . any error might arguably have been harmless"). But the argument does not go far enough, because after concluding that the Plaintiff's CAD was a non-severe impairment, the ALJ did not "properly" proceed with the RFC analysis for the reasons discussed above.

In the SSA's hierarchy of exertional levels, "sedentary work" is the least stressful. 20 C.F.R. §§ 404.1567, 416.967. But the term is not entirely devoid of meaning. To find that the Plaintiff was capable of the "full range of sedentary work" without limitation, the ALJ needed a sufficient basis for concluding that a man whose coronary artery is half-blocked – and whose cardiologist says he has a heart murmur, and whose severe impairment of hypertension persists even after administration of anti-hypertensive medication, and who testified to dizzy spells that interfere with his ability to walk, *etc*. – can nevertheless lift up to ten pounds and stand and walk for up to two hours in an eight-hour shift. *Id.*; *see also* SSR 96-9p, 1996 WL 374185. Presumably, cases in which no such basis appears anywhere in a 2,000-plus page administrative record will be quite rare. But this is such a case, and the Court will accordingly order that it be remanded for further development of the administrative record.

**B.      Application of the Foregoing Principles to the Plaintiff's Other Claims**

The Plaintiff's other claims of error present closer calls.  For example, he contends that the ALJ erred in failing to obtain treating source opinions from his mental health providers (ECF No. 14-2, at 7), but the record is less clearly inadequate with respect to his mental impairments than with respect to his CAD.  On the one hand, notes from his treating APRN, Lori Pelosi, reflect a diagnosis of "[m]ajor depressive disorder, recurrent severe," albeit "without psychotic features." (R. 1932.)  And courts in this Circuit generally hold that the need for treating physician input can be particularly strong in the context of mental impairments.  *E.g., Urena v. Berryhill*, No. 18-CV-3645 (JLC), 2019 WL 1748131, at *14 (S.D.N.Y. Apr. 19, 2019) ("[T]he mandate of the treating physician rule to give greater weight to the opinions of doctors who have a relationship with a plaintiff is particularly important in the mental health context.") (internal citations omitted).  On the other hand, the record does contain a report from a consulting examiner, psychologist Cheryl Ellis, that talks about the Plaintiff's mental impairments in seemingly functional terms.  (R. 1712-16) (addressing the Plaintiff's ability to engage in activities of daily living, social functioning, concentration, persistence, etc.).

Dr. Ellis's report creates a distinction between the Plaintiff's CAD and his mental impairments.  Whereas the question presented by the CAD is whether an ALJ can formulate an RFC solely from raw medical data, without input from any medical provider on the functional import of that data, the question presented by the mental impairments is whether the slender functional discussion in Dr. Ellis's report provides substantial evidence for the ALJ's conclusions.[4]

---

[4]      Although the second question is different from the first, there are reasons to suppose that it should likewise be answered "no."  To begin with, as noted above, the Second Circuit has "cautioned that ALJs should not rely heavily on the findings of consultative physicians after a single examination."  *Selian*, 708 F.3d at 419.  This "concern is even more pronounced in the context of mental illness," because a "one-time snapshot of a claimant's status may not be

In light of its disposition of the CAD issue, the Court declines to decide these close calls. "The issue of whether an ALJ has satisfied his obligation to develop the record is one that must be addressed as a threshold issue." *Camarota v. Comm'r of Soc. Sec.*, No. 3:19-CV-0133 (RMS), 2020 WL 132437, at *5 (D. Conn. Jan. 13, 2020) (internal quotation marks omitted). Because the Court concludes that there has been at least one reversible failure of the duty to develop the record, it declines to decide the remaining arguments because "upon remand and after a *de novo* hearing, [the ALJ] shall review this matter in its entirety." *Faussett v. Saul*, No. 3:18-CV-738 (MPS), 2020 WL 57537, at *5 (D. Conn. Jan. 6, 2020) (internal quotation marks omitted); *see also Delgado v. Berryhill*, No. 3:17-cv-54 (JCH), 2018 WL 1316198, at *19 (D. Conn. Mar. 14, 2018) (holding that because the case was "already being remanded for other reasons," and "because [the Plaintiff's] RFC may change after full development of the record," the ALJ would likely to need to reconsider the other steps in the five-step analysis).

## IV.   CONCLUSION AND ORDER

For the foregoing reasons, the Plaintiff's Motion to Reverse the Decision of the Commissioner (ECF No. 14) is **GRANTED IN PART AND DENIED IN PART.**  It is **GRANTED** to the extent that it seeks an order remanding the case to the Commissioner for re-hearing after further development of the administrative record, but it is **DENIED** to the extent that it seeks an order remanding the case solely for an award and calculation of benefits.[5]  The

---

indicative of her longitudinal mental health." *Estrella v. Berryhill*, 925 F.3d 90, 98 (2d Cir. 2019). Moreover, there are seeming gaps in the Plaintiff's mental health treatment records.  The record shows that he was seeing a psychologist or psychiatrist for his depression and anxiety, from at least January 4, 2017 to November 1, 2017, but the ALJ did not have records from this treatment. (R. 296, 308.)

[5]      To remand solely for calculation of benefits, the Court "must find that, irrespective of the legal error, the record contains 'persuasive proof' of the claimant's disability and 'a remand for further evidentiary proceedings would serve no purpose.'" *Casanova v. Saul*, No. 3:19-cv-00886 (TOF), 2020 WL 4731352, at *2 (D. Conn. Aug. 14, 2020) (quoting *Parker v. Harris*, 626 F.2d

Defendant's Motion for an Order Affirming the Decision of the Commissioner (ECF No. 22) is

**DENIED.**  Pursuant to sentence four of 42 U.S.C. § 405(g), that decision is **VACATED,** and the

matter is **REMANDED** to the Commissioner for a re-hearing after further development of the

administrative record consistent with this opinion.  Upon remand, the Commissioner shall consider

all of the Plaintiff's claims of error not discussed in this decision.  *Casanova*, 2020 WL 4731352,

at *6; *Pacheco v. Saul*, No. 3:19-cv-00987 (WIG), 2020 WL 113702, at *8 (D. Conn. Jan. 10,

2020) ("On remand, the Commissioner will address the other claims of error not discussed

herein."); *Moreau v. Berryhill*, No. 3:17-cv-00396 (JCH), 2018 WL 1316197, at *4 (D. Conn. Mar.

14, 2018) ("Because the court finds that the ALJ failed to develop the record, it also suggests that

the ALJ revisit the other issues on remand, without finding it necessary to reach whether such

arguments would themselves constitute legal error justifying remand on their own.").

This is not a recommended ruling.  The parties consented to entry of a final judgment by a

magistrate judge (ECF No. 8), and accordingly **the Clerk of the Court is directed to enter**

**judgment in favor of the Plaintiff and close the case.**  Any appeal from the Court's judgment

may be made directly to the appropriate United States Court of Appeals.  *See* 28 U.S.C. §

636(c)(3); Fed. R. Civ. P. 73(c).


_____
*/s/ Thomas O. Farrish*
Hon. Thomas O. Farrish
United States Magistrate Judge

---

225, 235 (2d Cir. 1980)).  The Court has examined the entire administrative record, and it finds no
"persuasive proof" of the Plaintiff's disability.  Remand for calculation of benefits would therefore
be inappropriate.